577 F.2d 394
 INDIANA HARBOR BELT RAILROAD COMPANY, Petitioner,
United States of America and Interstate Commerce Commission,
Respondents,
v.
GENERAL AMERICAN TRANSPORTATION CORPORATION, Union Tank Car
Company, North American Car Corporation, U. S. Railway
Manufacturing Company, Manufacturing Chemists Association,
Pullman Leasing Company, and U. S. Railway Equipment
Company, Intervenors.
 No. 77-1676.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 13, 1978.
Decided May 25, 1978.
 
 Anna M. Kelly, Chicago, Ill., for petitioner.
 Henri F. Rush, I. C. C., Washington, D. C., Martin Lucente, Robert R. Tepper, Chicago, Ill., for respondents.
 
 
 1
 Before FAIRCHILD, Chief Judge, TONE, Circuit Judge, and SHARP, District Judge.*
 
 
 2
 ALLEN SHARP, District Judge.
 
 
 3
 This is an appeal from a determination by the Interstate Commerce Commission (the "Commission") that the Indiana Harbor Belt Railroad Company ("IHB") may not assess additional charges for the empty movement of privately-owned freight cars for ordinary repairs once they have entered the national car fleet and must participate in an excess empty mileage "equalization" rule published by the nation's railroads. It was initiated by a petition for judicial review filed with this Court by IHB on July 5, 1977.
 
 
 4
 The Commission's determination was made in a decision served on June 15, 1977 encompassing four separate Commission proceedings. They had been consolidated for disposition because all "deal with the issue of the lawfulness of any separate charge for the switching of empty privately-owned cars for ordinary repairs."
 
 
 5
 General American Transportation Corporation, Union Tank Car Company, and North American Car Corporation v. Indiana Harbor Belt Railroad Company, No. 35404, U. S. Railway Mfg. Co. v. Indiana Harbor Belt Railroad Company, No. 36269, Charges for Moving Empty Private Tank Cars on Own Wheels, No. 36379, and Charges for Movement of Empty Cars, East Camden and Highland Railroad Company, No. 36116, are the four cases embraced by the Commissioner's decision. The last of these is not before the Court because it did not involve IHB's charges, IHB was not a party to it and neither IHB nor anyone else has sought review of the Commissioner's decision as it applies to that case.
 
 
 6
 Dockets Nos. 35404 and 36269 were complaints by freight car manufacturing companies against IHB's assessment of switching charges pursuant to a claim that its existing tariffs applied to the empty movement of privately-owned cars to and from repair shops owned by those companies and located on IHB's tracks. Complainants argued that the tariff items under which the charges were assessed were inapplicable by their own terms and unlawful in any event because once freight cars have entered the national car fleet they become "instrumentalities of transportation", rather than "articles of commerce", and are then no longer subject to charges applicable to the transportation of property.
 
 
 7
 Docket No. 36379 was an investigation into the lawfulness of new tariff items published by IHB to overcome the objection that the charges it had been assessing on movements of empty privately-owned cars to and from repair shops were inapplicable by their own terms. The investigation also included the general issue of the lawfulness of any such tariff publication. The car manufacturer complainants in Dockets Nos. 35404 and 36369 were protestants in Docket No. 36379. Manufacturing Chemists Association ("MCA"), a non-profit trade association whose members account for more than half the total dollar investment in the privately-owned tank car fleet and a substantial portion of the total dollar investment in privately-owned covered hopper cars, was an intervening protestant in Docket No. 36379.
 
 
 8
 The Commission and the United States of America are Respondents to IHB's Petition here. Complainants, protestants and intervening protestant MCA have intervened in this judicial review proceeding in opposition to the relief sought by IHB.
 
 JURISDICTION OF THE COURT
 
 9
 Our jurisdiction to review the order is derived from 28 U.S.C. §§ 2342 and 2321.
 
 
 10
 The petitioner's right to appeal the decision and order of the Interstate Commerce Commission is grounded on Title 5, U.S.C.A., §§ 701-706, commonly known as the Administrative Procedure Act. Section 702 provides:
 
 
 11
 "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof . . . "
 
 
 12
 This petition seeks to have the order of the Commission reversed and set aside as being in excess of the Commission's power, without a rational basis, not supported by substantial evidence in the record, and arbitrary and capricious in some respects.
 
 ISSUE
 
 13
 Is the Commission's determination that any railroad, including the IHB, which participates substantially in the revenue generated by loaded movements of the privatelyowned freight cars may not assess additional charges for the empty movement of such cars for ordinary repairs once they have entered the national car fleet and must participate in a nationwide "equalization" rule designed to allocate the responsibility for empty car mileage proportionally among those railroads which participate in loaded privately-owned car movements, rational and within the Interstate Commerce Commission's statutory powers?
 
 ICC HOLDINGS
 
 14
 Specifically, the Commission determined: 1. IHB lawfully may not assess separate additional charges for switching empty privately-owned cars (tanks and other rail cars) for ordinary repairs and thus it must cancel its published exceptions to certain master tariff provisions published on behalf of all of the nation's railroads; 2. certain other tariff provisions published by IHB purporting to establish local switching charges for such repair movements are inapplicable, but if applicable, would be unlawful, thereby necessitating a refund of amounts already collected; and 3. IHB must participate in a uniform "equalization" rule published on behalf of all of the nation's other railroads, as the means by which the railroad industry is compensated for the cost of excess empty movements of tank cars.
 
 STANDARDS OF REVIEW
 
 15
 The responsibility of the court in reviewing a decision and order of the Commission properly before it consists in deciding 1. whether the Commission has acted within the power delegated to it by law; 2. whether the Commission's decision is supported by facts or substantial evidence; 3. whether the order is based on specific findings of fact from the record; 4. whether the Commission's conclusions have a rational basis.
 
 
 16
 This Court reminds the Commission that our task requires a review of the whole record. Following the admonition of the Supreme Court in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the Court held in Chicago Rock Island and Pacific Railroad Company v. United States and the Interstate Commerce Commission, 205 F.Supp. 378 (N.D.Ill.1962), that the scope of judicial review of an order of the Interstate Commerce Commission is not limited merely to an examination of the evidence supporting findings reached by the Commission, but is based upon a review of the whole record. This scope of review is the result of the enactment of the Administrative Procedure Act, 5 U.S.C. § 706. That statute contains an express direction to reviewing courts to consider the "whole" record in determining whether administrative findings have the required evidentiary support.
 
 
 17
 As the Supreme Court observed with respect to the same requirement in the Labor Management Relations Act of 1947 in Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 464 (1951):
 
 
 18
 "Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record."
 
 
 19
 Of the same purport was the decision in National Labor Relations Board v. Pittsburgh S.S. Co., 340 U.S. 489, 71 S.Ct. 453, 95 L.Ed. 479 (1951). See also, Schwartz, A Decade of Administrative Law, 51 Mich.L.Rev. 775 (1953), as well as such recent decisions as National Labor Relations Board v. Isis Plumbing & Heating Co., 322 F.2d 913 (9th Cir. 1963); National Labor Relations Board v. Walton Mfg. Co., 322 F.2d 187 (5th Cir. 1963); and Lawson Milk Co. v. National Labor Relations Board, 317 F.2d 756 (6th Cir. 1963).
 
 
 20
 In determining whether there is substantial evidence of public convenience and necessity to support the Commission's findings and decision here, we must carefully examine all of the evidence presented to the Commission.
 
 
 21
 This Court will now turn to the issues raised in Dockets 35404, 36269, 36379, the order requiring IHB to participate in the recently established excess mileage equalization rule applicable to privately-owned tank cars and the Commission's statutory authority to regulate the railroad industry.
 
 DOCKETS 35404; 36269
 
 22
 Docket No. 35404 was initiated by a complaint filed on April 14, 1971. It raised two distinct issues, i. e., was the switching charge published by IHB applicable to movements of empty privately-owned freight cars to and from repair shops, once such cars had entered the national car fleet, and would the assessment of such charges, by a railroad which participates substantially in revenues from loaded privately-owned car movements, if applicable, otherwise be lawful under the Interstate Commerce Act. While that case was pending a similar applicability question was resolved against IHB in Switching Cars to and From Repair Shops, 341 I.C.C. 57 (1972), affirmed by this Court in Indiana Harbor Belt Railroad Company v. U. S., I. C. C. et al., 510 F.2d 644 (7th Cir. 1975), cert. den. 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694. On November 19, 1975, another complaint was filed against IHB raising the same issues of tariff applicability and lawfulness generally. It was docketed by the Commission as No. 36269. Both Commission proceedings resulted in conclusion by Administrative Law Judges that IHB's switching charges were inapplicable by their own terms to empty privately-owned cars moving to and from repair shops once those cars had entered the national car fleet. We agree.
 
 
 23
 The Commission's decision was explicitly based upon prior case law governing similar questions of tariff interpretation. Suffice it to say that it is inconceivable that the Commission's determination that the more particular tariff ought to control over the more general can be said to be without "a rational basis."
 
 
 24
 Moreover, this Court has already determined the issue in Indiana Harbor Belt Railroad Co. v. United States of America, supra. In the earlier case, the IHB argued that its general provision for the assessment of charges for empty car movements contained in a provision of the Local Tariff controlled over the specific language of a prior version of the Mileage Tariff. In the earlier case, the Interstate Commerce Commission had ruled against the IHB strictly on tariff interpretation grounds. The Commission concluded that a canon of construction requires that a specific tariff provision must take precedence over a more general tariff provision, especially if the more general provision would negate the tariff scheme embodied in the more specific provision. Although the District Court reversed the Commission's order, this Court reversed the District Court and reinstated the Commission's order, reasoning that the question was "a matter peculiarly within the competence of the Commission to determine . . . ." 510 F.2d at 649. Not only are the same principles present at bar, the tariffs themselves are almost identical.
 
 
 25
 Or more simply stated, the Commission held that IHB could not assess a switching charge published in its local tariff because it was in conflict with the provisions of the Mileage Tariff requiring movement of empty privately-owned cars to and from repair shops on the IHB without extra charge. Although the Commission there expressly refrained from considering the lawfulness of such a charge in and of itself because it was found to be inapplicable by its own terms, the Commission did observe:
 
 
 26
 "In Union Tank Car Co. Terminal Service, 268 I.C.C. 338 (1947), it was determined that tank cars are instrumentalities of transportation and that they are not subject to transportation charges when temporarily withdrawn from service for repairs. Line-haul carriers were respondents in that case, although the final switching to repair shops occurred in a terminal area.
 
 
 27
 In Mileage Allowances, Tank Cars, 337 I.C.C. 23, 57 (1970), it was concluded, among other things, that ordinary repairs are an unavoidable incident to the performance of transportation by the use of privately owned freight cars and that it would be inappropriate to subject such empty mileage to freight rates. That report also indicated which empty movements of freight cars may be considered as within the scope of an instrumentality of transportation, and included therein, among other types of movements, were those to and from repair shops." (341 I.C.C. at p. 62)
 
 
 28
 The framework within which this case arose and has been decided by the Commission has been fully set forth above. The instant decision is entirely consistent with the Commission's historical treatment of these issues as they apply to the railroad industry as a whole. As Mr. Justice Marshall wisely recognized in Atchison, T. & S.F. R. Co. v. Wichita Board of Trade, 412 U.S. 800, 807-08, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973), an agency may articulate the basis of its order by reference to other decisions, which decisions may on their own serve as vehicles for the formulation and application of agency policies. He concluded that:
 
 
 29
 "A settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is then, at least a presumption that those policies will be carried out best if the settled rule is adhered to (id.)."
 
 
 30
 IHB alone, of all the nation's railroads, would have the Commission's heretofore settled course, the bases for which have been fully set forth by the Commission in other proceedings and reiterated in the Report under review, struck down upon the mere assertion that it amounts to giving "free" transportation to shipper-furnished cars. In view of the foregoing and this Court's prior decision in Indiana Harbor Belt Railroad Co. v. United States, supra, an extraordinarily strong presumption of validity favors the Commission's decision here. IHB has totally failed to overcome this presumption, as recognized by this Court in denying IHB's motion for stay pending judicial review on the ground that "there is little likelihood that Indiana Harbor Belt Railroad Company will prevail on the merits of the underlying appeal." (Order of August 4, 1977).
 
 
 31
 Therefore, in light of previous case authority, this Court finds no reason to disturb the ICC ruling as to Dockets 35404 and 36269.
 
 DOCKET 36379
 
 32
 On July 1, 1976 IHB published new tariff items which overcame any objection to the future assessment of switching charges on such movements based upon tariff applicability. Protests were filed by the car manufacturers on the grounds that the new tariff publication would be unlawful. The Commission initiated an investigation into the lawfulness of the new tariff items and broadened its inquiry to include the lawfulness of any charge for switching empty privately-owned cars to and from repair shops by any railroad in Docket No. 36379.
 
 
 33
 The issue before the Commission in Docket No. 36379 concerned the lawfulness of certain IHB exception items in the Mileage Tariff imposing charges for switching movements to and from repair facilities. The Commission concluded that these separate charges for repair movements were unlawful and accordingly ordered their cancellation. We agree.
 
 
 34
 The Commission initially noted that IHB's status as a switching carrier did not exempt IHB from the fundamental common carrier obligations to furnish suitable equipment for the transportation of all traffic handled by it and to maintain such equipment in proper condition for transportation use. This conclusion regarding IHB's status is clearly correct and is supported by prior adjudication of the same issue. In Cancellation of Private Car Allowances, 322 ICC 565 (1964), the Commission rejected IHB's claim that its status as a switching line relieved it of the obligations contained in the Mileage Tariff. The Commission held that as a user of private cars, IHB was required to accept the obligations of the Mileage Tariff as do all other carriers using such equipment. This conclusion was affirmed by a three-judge district court in The Baltimore & Ohio Chicago Terminal Railroad Company v. United States, 279 F.Supp. 270 (N.D., Ill. 1967) and ultimately by the Supreme Court (389 U.S. 88 (1967)).
 
 
 35
 The Commission also concluded that IHB derives substantial benefits, both direct and indirect, from the loaded movements of private cars over its line, that such cars constitute instrumentalities of transportation essential to the fulfillment of IHB's common carrier obligations, and that movements of such cars to repair shops were necessary for their maintenance in proper condition for transportation purposes. This combination of factors, the Commission concluded, made it unlawful for IHB to impose a separate switching charge on such movements because the movements in question were not movements of property but of an essential instrumentality of transportation.
 
 
 36
 In this connection this Court emphasizes the Commission's conclusion that "switching for repairs cannot be considered a distinct rail service whether performed by a line-haul or switching carrier." The Commission referred to its recent directive in Ex Parte No. 331 pursuant to Section 15(18) of the Act where the Commission prescribed procedures for establishment of separate rates for distinct rail services. The Commission emphasized that it had defined a distinct rail service as "those railroad transportation services, which are separate from line-haul transportation services necessary for the movement of freight." Applying this definition, the Commission concluded that ordinary repairs "are clearly necessary to the line-haul movement of freight," and "also essential to loaded revenue switching movements" and are thus not separate or distinct services. These findings and conclusions are fully supported by the record and are not effectively challenged by IHB.
 
 
 37
 In the context of these findings and conclusions the switching charge which IHB seeks to impose on repair movements constitutes the assessment of a charge, in addition to the published charges on loaded movements, for a service which is part of the transportation service required for the movement of freight. This double charge imposed by IHB's exception items is an obvious and direct violation of Section 1(5) of the Interstate Commerce Act which requires that all charges for transportation services shall be "just and reasonable." (49 U.S.C. § 1(5)). Similarly, the imposition of such a separate and additional charge for a service which is part of the transportation service comprehended by the charge for loaded movements violates Section 1(6) which requires the establishment and observance of just and reasonable regulations and practices affecting rates or tariffs and which makes unlawful every unjust and unreasonable regulation or practice. (49 U.S.C. § 1(6)). The imposition of such a charge on empty repair movements also violates Section 1(11) of the Act which requires all carriers to establish, observe and enforce just and reasonable rules, regulations and practices with respect to car service and prohibits every unjust and unreasonable rule, regulation and practice. Car service is defined in Section 1(10) to include the "use, control, supply, movement, distribution, exchange, interchange and return of locomotives, cars and other vehicles used in the transportation of property, including special types of equipment." Clearly, the imposition of a switching charge on a movement of cars which is a part of the transportation service comprehended by the charge on loaded movements is an unreasonable and unlawful car service practice. The Commission accordingly required cancellation of the offending tariff provisions.
 
 
 38
 IHB's primary challenge to these determinations is the claim that they require IHB to provide "free transportation" and that the Commission has no statutory authority to impose such a requirement. This challenge to the Commission's order is totally misplaced. In none of the dockets here under review did the Commission order IHB to provide free transportation or in any manner conclude that it had the power to do so. Indeed, the whole basis of the Commission's determination in Docket No. 36379 is that IHB, through its participation in thousands of miles of loaded movements of intervenor's cars, is compensated for empty movements in that it derives "substantial revenue" and "economic benefit" from the loaded movements of those cars on its line. In so concluding, the Commission followed a long line of precedent which holds that once privately owned cars enter the national railroad car fleet and are loaded in commercial service, they lose their status as "property" subject to freight charges and become "instrumentalities of transportation" which, because they directly or indirectly benefit all carriers who charge for the loaded movement of those cars, are not subject to additional charge when moving empty to repair facilities. Union Tank Car Co., 268 I.C.C. 338 (1947); Mileage Allowance, Tank Cars, 337 I.C.C. 23 (1970).
 
 
 39
 In arriving at this correct conclusion regarding the benefit derived from charges on loaded movements, the Commission did not merely rely on its previous decisions. Contrary to IHB's assertion that "no showing appears in the record" that "compensation for empty repair movements may be derived from freight rates" the Commission cited and relied upon more than substantial evidence which directly supported its conclusions.
 
 
 40
 Therefore, this Court finds no reason to disturb the ruling of the I.C.C. as
 
 
 41
 to Docket No. 36379. THE DECISION'S REQUIREMENT THAT IHB
 
 PARTICIPATE IN THE EXCESS EMPTY MILEAGE
 EQUALIZATION RULE IS RATIONAL
 
 42
 While it has been clear for some time, despite IHB's position in this litigation, that there would be no separate charge against shippers for necessary repair movements of privately-owned cars because the railroad industry as a whole is already directly or indirectly compensated for such services, it is equally clear that certain railroads may be performing more than their share of this obligation. While the persistence of this problem has been a matter of concern to many, until the establishment of the Equalization Rule, effective January 1, 1977, there was no vehicle in existence to balance the disproportionate burdens of those railroads performing relatively more or less non-revenue switching services.
 
 
 43
 The Commission's Decision first states the need for some sort of resolution of the problem. It says:
 
 
 44
 "The need for such repairs of privately-owned cars will usually arise as a result of use by many different carriers over a considerable period of time. Each such carrier is partially responsible for the need for repairs, and ideally the costs should be charged to each carrier accordingly. However, such an apportionment is impossible as a practical matter. The costs of moving 'instrumentalities of transportation' must be compensated for in such a manner that no carrier which accrues a greater than average portion of these costs will be unduly burdened. Rather than costs for which precise compensation for particular services is possible, the costs of repair movements of privately- owned cars must be treated as a common cost which must be shared by all carriers which derive revenue from the national private-car fleet. These 'shared costs' must be compensated for as evenly as possible, for the absence of a comprehensive nation-wide scheme to distribute the cost burden in proportion to the amount of economic benefit enjoyed by individual carriers from private care use would be overcompensated while others would indeed be performing 'free' transportation. . . ." (Commission Decision, pp. 35-36)
 
 
 45
 It then describes the working of the equalization rule published by the railroads in detail and finds that:"It allocates responsibility for all non-revenue empty movements in proportion to actual movements and results in a fairer distribution of responsibility and benefits than any system of individual charges could achieve. It reflects a more equitable approach to the practical problem of allocation of responsibility for empty repair movements than any other solution proposed by any party to this proceeding." (Commission Decision, p. 37)
 
 
 46
 By way of reemphasis, in its "Summary and Findings", the Commission's Decision again stresses the significance and need for an equalization rule. It says:
 
 
 47
 "Seven years ago, in the Mileage Allowance cases, the Commission cautioned the concerned parties that a nationwide solution was necessary to ensure that carriers which experienced excessive empty non-revenue mileage would be justly compensated for the costs of such movements. Only as a result of a compromise agreement filed in the Manufacturing Chemists case was such a solution published for tank cars. While potential problems still may remain to be ironed out, the 105 percent equalization rule appears to be a workable, equitable solution to a perplexing problem." (Commission Decision, pp. 46-47)
 
 
 48
 The Decision then directs the railroad industry to "provide similar equitable treatment of carriers utilizing other privately-owned cars.", i.e. private cars other than tank cars. It gives the railroads and other parties until December 31, 1977 to develop a rule voluntarily and provides for the institution of a rulemaking proceeding if they fail to do so. It directs the railroads to provide for all types of cars which generate excessive empty mileage on particular carriers, because "only in this way can shared costs such as those of repair movements of privately-owned cars be evenly distributed." (Commission Decision, p. 47) Ultimately, the Commission's Decision makes these findings:
 
 
 49
 "We further find that the 105 percent equalization provision contained in Item 120 of Doyle's Mileage Tariff 7-F appears to be a workable solution to the problem of under-compensation of certain railroads due to excessive empty non-revenue mileage, and that IHB, along with all other railroads which derive direct or indirect economic benefit from the use of privately-owned tank cars, must participate in this provision so that it and all other lines will be justly and reasonably compensated for its share of the costs of maintaining a privately-owned car fleet. We further find that there is an urgent need to establish a similar provision or provisions for privately-owned cars other than tank cars, whether by voluntary cooperative effort or by rule-making." (Commission Decision, p. 49)
 
 
 50
 IHB can have no legitimate quarrel with any rule designed to require a balancing of the "common" or "shared" railroad obligation to perform empty repair movements. It does, as it acknowledges on page 21 of its Brief to this Court, participate in the Commission prescribed equalization rule in part. It proposes to exempt itself from application of the rule to the extent that it includes empty repair movement mileage. As to the latter, IHB would prefer to assess a switching charge because this would produce more revenue.
 
 
 51
 While such a desire is understandable, it is no excuse for an unlawful act and it is no answer to a national problem requiring a national solution. IHB was apprised of the significance of the equalization rule, in its then proposed form, by the evidence of the parties in the administrative proceedings below. It had every opportunity to make its position known to the Commission and, in fact did discuss the rule in its representations. IHB's contention here that it was denied an opportunity to be heard is not supported by the record.
 
 
 52
 Therefore, this Court finds no reason to disturb the Commission's order requiring IHB to participate in the equalization rule.
 
 
 53
 THE COMMISSION'S DECISION IS WITHIN ITS STATUTORY AUTHORITY
 
 
 54
 IHB has challenged the Commission's authority to require it to provide empty repair movements for privately-owned cars without extra compensation and to participate fully in the excess empty mileage equalization rule. It does so primarily on the ground that the Commission acts only under Section 15(13) of the Act when it fixes compensation and prescribes rules and regulations governing the use of privately-owned cars. Because Section 15(13) of the Act authorizes only the establishment of the maximum allowances to be paid to shippers furnishing "services connected with transportation", IHB argues that the Commission could do no more in these proceedings. While IHB's argument would have been compelling in 1916, it has not been the law since the passage of the Esch Car Service Act of 1917, now codified as Section 1(14)(a) of the Act, 49 U.S.C. § 1(14)(a). This provision gives the Commission all-encompassing jurisdiction to establish "reasonable rules, regulations, and practices with respect to car service" including "the compensation to be paid for the use of any . . . freight car", the "other terms of any . . . arrangement for the use of any . . . vehicle . . . and whether or not owned by another carrier, shipper, or third party."
 
 
 55
 Shortly after the original version of these provisions of the Act was passed, the Commission commented upon its significance in In Re Private Cars, 50 ICC 652, 672 (1918). It said:
 
 
 56
 "The Congress has thus recognized the use of privately owned cars in transporting the commerce of the country, and has provided for their control by the Commission through rules and regulations of carriers hauling them." (50 I.C.C. at p. 672)
 
 
 57
 In the Mileage Allowances cases, the Commission expressly considered whether its jurisdiction in the area of privately-owned cars was limited to the prescription of maximum allowances under Section 15(13) as now argued by IHB and contended there by the railroads, including IHB. It concluded:
 
 
 58
 "If individual shippers furnishing their cars can rely only on the maximum rate provisions of Section 15(13), then it would seem to be open to the carriers to pay nominal allowances therefore, unrelated to shipper costs. * * * (337 I.C.C. at p. 39)
 
 
 59
 ". . . we agree with the examiners that the Commission is permitted by Section 1(14)(a) to prescribe the specific allowances carriers must pay for cars furnished by shipper to transport specific shipments. (337 I.C.C. at p. 26, emphasis added)
 
 
 60
 "We find that the Commission has jurisdiction under Section 1(14)(a) of the act to prescribe just and reasonable allowances . . ." (337 I.C.C. at p. 34)
 
 
 61
 It also adopted the Examiner's conclusion that:
 
 
 62
 "The Esch legislation in 1917 conferred upon the Commission a broad authority to regulate railroad 'car service,' which that act defined to include: 'the movement, distribution, exchange, interchange, and return of cars used in the transportation of property by any carrier subject to the provisions of this Act.'
 
 
 63
 "Shortly after the Esch enactment, the Commission conducted a general investigation of railroad practices involving use of privately owned freight cars. One specific objective stated in the formal order of investigation was to determine what compensation should be determined. In its decision the entire Commission discussed its section 15(13) power over carrier practices involving privately furnished cars, and it concluded that the Esch amendments had supplemented that section 15(13) authority . . ." (337 I.C.C. at p. 36)
 
 
 64
 Clearly, the limits of the Commission's authority to act with respect to rules and regulations governing railroad use of privately-owned cars are governed by the "car service" provisions of Section 1(14)(a), rather than the maximum allowance provided for in Section 15(13). By definition, the Commission's powers under Section 1(14)(a) are limited only by the requirement that the result of their exercise be reasonable. A contrary conclusion, as urged by IHB, would require the elimination of more than fifty years of history. The Commission's Decision has been shown to be rational and supported by the evidence. Its orders do not extend beyond the mandate conferred by Section 1(14)(a) of the Act.
 
 CONCLUSION
 
 65
 Therefore, in light of the standard of review enunciated in Universal Camera Corp., supra, this Court now affirms the ruling of the Interstate Commerce Commission in all respects.
 
 
 
 *
 The Honorable Allen Sharp, United States District Court for the Northern District of Indiana, is sitting by designation