611 F.2d 1184
 The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a
corporation, Plaintiff- Appellee,
v.
UNION TANK CAR COMPANY, a corporation, Defendant-Appellant.
UNION TANK CAR COMPANY, Petitioner-Appellant,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents- Appellees,
and
The Atchison, Topeka and Santa Fe Railway Company, a
corporation, Intervening Respondent-Appellee.
 No. 79-1182.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 14, 1979.
Decided Oct. 12, 1979.
 
 Thomas F. McFarland, Jr., Chicago, Ill., for defendant-appellant.
 Gerald B. Fleming, ICC, Washington, D.C., Richard E. Weicher, Chicago, Ill., for plaintiff-appellee.
 Before SWYGERT, TONE and BAUER, Circuit Judges.
 TONE, Circuit Judge.
 
 
 1
 Union Tank Car Company leased 148 of its tank cars for use in Mexico. On termination of the leases the cars were transported, pursuant to Union Tank's directions, from points in Mexico to repair and maintenance facilities in the United States. The issue in this case is whether Union Tank must pay freight charges for the movement of the cars from the Mexican border to the repair and maintenance facilities. The answer depends upon the interpretation of two tariff provisions and provisions of the Interstate Commerce Act. The Interstate Commerce Commission held Union Tank liable in Union Tank Car Co. Declaratory Order Empty Tank Cars, No. 36473 (I.C.C. Dec. 13, 1977). The district court sustained the Commission. We affirm.
 
 
 2
 Union Tank leased the cars to Mexican shippers sometime before August 16, 1973 for periods varying in length from a few months to several years. The cars were used exclusively in Mexico during the lease periods.[1] When each lease expired, the Mexican lessee, acting pursuant to Union Tank's instructions, caused the empty cars to be transported to the Mexican-American border at El Paso, Texas, and turned over to the Atchison, Topeka and Santa Fe Railway Company. The Santa Fe then transported the cars to Union Tank's repair and maintenance facilities in Kansas, Louisiana, and Illinois, as directed by Union Tank,[2] and billed it at the rate prescribed in the Uniform Freight Classification.[3]
 
 
 3
 Union Tank refused to pay, arguing that the following tariff provision, which we shall call simply Paragraph B.3, was applicable and made any charge impermissible:
 
 
 4
 An empty tank car, after having been loaded in commercial service on which the railroads derived line haul revenue, will be moved without charge to and from facilities for cleaning, lining, relining, maintenance, modification, or repair upon receipt of instructions, confirmed in writing, showing facility, destination and full routing and reason for such movement.[4]
 
 
 5
 The Santa Fe rejected Union Tank's excuse for nonpayment, asserting that because the cars had been withdrawn from service in the United States, the provision relied on by Union Tank was inapplicable and the tank cars were "newly acquired" within the meaning of the following tariff provision, which we shall call Paragraph B.5:
 
 
 6
 A new car or a newly acquired car moving prior to its first loaded move in commercial service . . . will be moved subject to applicable rates named in Consolidated Freight Classification and/or Uniform Freight Classification, . . ., or other applicable tariffs.[5]
 
 
 7
 Nevertheless, Union Tank persisted in its refusal to pay.
 
 
 8
 In June, 1976, the Santa Fe filed suit in the United States District Court for the Northern District of Illinois against Union Tank to recover the unpaid transportation charges.[6] Union Tank moved to stay the action on the ground that its defense to the Santa Fe's claim raised issues within the ICC's primary jurisdiction. See generally United States v. Western Pacific Railroad, 352 U.S. 59, 62-70, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); 3 K. Davis, Administrative Law Treatise § 19.01 (1958). After the district court granted the motion Union Tank filed a petition with the Commission for a declaration that Paragraph B.5 was either inapplicable or unjust and unreasonable as applied.[7] The Administrative Law Judge concluded that Paragraph B.3 applied and no charges could be made. He reasoned that the cars were subject to that provision because, before being leased for use in Mexico, they had been used in the United States by railroads that were parties to the tariff, and because nothing in the language of the tariff prevented the application of Paragraph B.3 following a "temporary" removal of a car from the fleet, however long the removal and whatever its purpose. On appeal, Division Two of the Commission rejected this reasoning. Finding that the maintenance undertaken after the empty mileage in question had resulted from the commercial loaded movements made in Mexico, the Division concluded that Union Tank had removed the cars from the domestic commercial fleet, and that the cars were "newly acquired" by Union Tank under Paragraph B.5 and thus not entitled to free transportation to repair facilities without first making a commercial loaded movement within the United States.[8]
 
 
 9
 Dissatisfied with this result, Union Tank filed an action in the district court to set aside the order. The case was assigned to the judge before whom the Santa Fe's earlier filed collection action was pending. The court, recognizing the limited scope of its review, E. g., Indiana Harbor Belt Railroad v. United States., 510 F.2d 644, 649 (7th Cir.), Cert. denied, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), noted that the Commission's interpretation of the tariff provisions was not the only one possible, but found it to be a reasonable one. The court also agreed with the Commission that Union Tank had failed to show that the tariffs were unlawful under § 1[9] of the Act, and therefore sustained the Commission's decision. This decision effectively disposed of both Mexican lease cases.[10] Although Union Tank seeks "(r)eversal . . . not only of the District Court's decision on judicial review, but also of the ICC's report and order which it reviewed," only the former is before us.[11]
 
 I.
 
 10
 Union Tank asserts that the phrase "newly acquired" is clear and unambiguous and can refer only to changes in ownership and that the ICC's reading of the phrase is "strained and unnatural" and therefore impermissible. See, e. g., Berman and Spector v. Atchison, Topeka & Santa Fe Railway, 308 I.C.C. 254, 256 (1959). We find the tariffs, considered together, sufficiently ambiguous to justify resort to administrative expertise. Union Tank's request for a stay on the ground that the doctrine of primary jurisdiction required submission of the tariff construction issue to the ICC indicates that it initially was of the same view. The district court's grant of the request as well as its final decision in the case show its agreement on this matter.[12] We shall examine the relevant tariff provisions in the context of the whole tariff as interpreted by prior Commission decisions.[13]
 
 
 11
 The tariff provisions under which Union Tank makes its claim rest in large part on a distinction between "property" and "instrumentality of transportation."[14] Although the railroads have traditionally supplemented their own rolling stock by using privately-owned cars supplied by shippers,[15] the duty to furnish cars is the railroads', not the shippers'.[16] Thus when railroads use cars other than their own to transport property or passengers, the cars are being used for the revenue purposes of the railroads and not for the private benefit of the owner. See Use of Private Passenger Train Cars, 155 I.C.C. 775, 786-87 (1929), Aff'd sub nom. Louisville & Nashville Railroad v. United States, 282 U.S. 740, 51 S.Ct. 297, 75 L.Ed. 672 (1931). The cars, albeit "property" in the ordinary sense of that term, are "instrumentalities of transportation" and therefore not subject to ordinary freight charges.[17] See General American Transportation Co. v. Indiana Harbor Belt Railroad, No. 35404, at 29-30 (I.C.C. June 10, 1977), Aff'd, 577 F.2d 394 (7th Cir. 1978) (hereinafter cited as GATCO ).
 
 
 12
 The issue thus becomes whether Union Tank's cars were moving as private property or as instrumentalities of transportation between El Paso and Union Tank's repair and maintenance facilities. This question is admittedly one of first impression and seems not to have been anticipated by the drafters of the tariff. Two decisions adopted by the Commission, however, give important guidance on this issue. In Union Tank Car Co., 268 I.C.C. 338 (1947), the Commission held that privately-owned tank cars remain instruments of transportation "when they are temporarily withdrawn from transportation service to undergo repairs." Id. at 342. The Commission reasoned that since railroads "have no use for a car that is not in good running order, . . . whether they or . . . (others) own it," the switching of cars to repair tracks was "primarily for their own benefit as common carriers." Id.[18] More recently, the decision of the administrative law judges that was upheld in pertinent part in Mileage Allowances, Tank Cars Between Points in the United States, 337 I.C.C. 23 (1970) (hereinafter cited as Mileage Allowances ), which established interim mileage allowances that railroads pay private owners for use of their cars, faced the issue of whether railroads could charge private car owners for empty mileage to and from facilities for relining or modification. The ALJs found the controlling question to be whether that work was "so major a transformation (of the car) as to interrupt the commitment of the car to the national tank car fleet." Id. at 62. Unlike the rebuilding or sale of a car, after which the car must again make a loaded commercial haul to reestablish its membership in the fleet, Id. at 61-62,[19] the work under consideration did not interrupt the car's commitment, and thus the railroads could not charge for such transportation.
 
 
 13
 Given the underlying theory of the tariff evidenced in these two decisions, the Commission's interpretation here was reasonable. Leasing the cars for use in Mexico interrupted the cars' commitment to the national tank car fleet. The movements from El Paso to the repair and maintenance facilities did not arise "directly from the transportation function," GATCO, supra, at 32, since the need for repairs resulted from use of the cars in Mexico, which produced no revenue for railroads who are parties to the tariff. Union Tank effectively removed its cars from a United States tariff system that generally provides free transportation to repair facilities for private car owners but assumes that such repair work resulted from movements producing revenue to railroad parties to the tariff. Union Tank should not be able to avail itself of the benefits of the system after withdrawing its cars from it. The cars in question could not be treated as instrumentalities of transportation until they had in fact been recommitted to domestic service by moving loaded in the United States.[20] It is not arbitrary or capricious to distinguish between this leasing arrangement and temporary removals of cars for the repair and maintenance that is necessitated by the American railroads' use of the cars.
 
 
 14
 Nothing in General American Transportation Co. (GATCO) v. Indiana Harbor Belt Railroad, No. 35404 (I.C.C. June 10, 1977), Aff'd, 577 F.2d 394 (7th Cir. 1978), requires a contrary holding. The Commission did decide in that case that, to be entitled to free transportation to repair facilities, the owner of a private tank car need not prove that the carrier providing the empty mileage has benefitted directly through the use of the owner's cars on revenue-producing hauls, but only that the carrier derives substantial revenue from the use of private cars. That holding might seem to suggest that Union Tank is entitled to free transportation from the Santa Fe even though the latter had not received any revenue from the cars' immediately preceding loaded movements in Mexico, because the Santa Fe makes substantial use of private cars. The Commission's GATCO decision, however, rested on the assumption that the cars in question constituted a part of the national private tank car fleet,[21] an assumption that does not hold true in the case at bar.
 
 
 15
 Thus the Commission's conclusion here that the cars were "property" moved "solely for the benefit of the car owner" and not the railroads, Union Tank Car Co. Declaratory Order Empty Tank Cars, No. 36473, at 6 (I.C.C. Dec. 13, 1977), is consistent with the language of the tariff provisions as well as the purposes they were intended to serve. We therefore agree with the district court that the Commission's interpretation of these provisions should not be disturbed.
 
 II.
 
 16
 Union Tank also contends that even if the district court properly sustained the Commission's decision as to tariff applicability, it erred in accepting that body's determination that collection of the charges had not been shown to be unjust and unreasonable. Union Tank's primary argument is that the Commission's failure to explain its decision requires a remand for findings of fact concerning the reasonableness of the practices complained of.[22] The district court found that the Commission's ruling on the reasonableness of the practices followed from its conclusion as to applicability.[23] In the context of this case, we agree.
 
 
 17
 First, as to § 1(6), Union Tank relies on unrebutted testimony by one of its witnesses that the Santa Fe's line-haul rates for goods shipped in privately-owned tank cars actually included compensation for the cost of transporting Union Tank's cars from Mexico, as well as empty cars in the national commercial fleet, to repair and maintenance facilities. The argument is that any additional charge would be an unjust and unreasonable practice affecting rates. Although inclusion of the Santa Fe's costs in moving those cars in the calculation of line-haul rates, if it occurred, would seem to result in excessive overall rates for shippers generally, the legality of those rates is not in issue here. That line-haul rates were too high would not entitle Union Tank to have its property transported without charge; and Union Tank did not argue that the tariff charges were too high generally, See note 23 And 49 U.S.C. § 1(5)(b). The only question before the Commission was whether existing and generally applicable tariff charges, not challenged as such, were "unjust and unreasonable" as applied specifically to these movements of Union Tank's property, and Union Tank cites no evidence in the record before the Commission that would have supported a finding in its favor on that question.[24]
 
 
 18
 Union Tank also contends that the charges assessed were unlawful under § 1(11).[25] According to one of Union Tank's witnesses, the mileage allowances paid to private car owners for the use of their cars do not compensate the owners for the cost of moving cars to repair facilities after the termination of leases in Mexico. Therefore, Union Tank argues, collection of transportation charges for moving its cars to repair facilities constituted an "unjust and unreasonable car service practice" proscribed by § 1(11). The substance of this argument is persuasive only given a preliminary conclusion that movement of empty cars from Mexico to repair facilities is a cost of providing railroad cars that the mileage allowance is designed to recognize. Our conclusion is to the contrary: such movements are solely for the private benefit of the owner and are not an aspect of providing an instrumentality of transportation to the carrier. In terms of the specific statutory language at issue, we hold that the movements under consideration do not constitute "car service" as defined in 49 U.S.C. § 1(10), I. e., "movement . . . of . . . cars . . . used in the transportation of property . . . by any carrier by railroad subject to (the provisions of the Act),"[26] but are instead movements of private property subject to the generally applicable rates. Accordingly, the Commission properly found that the charges had not been shown to be unjust or unreasonable and the district court properly affirmed the decision.
 
 
 19
 Union Tank had the burden of showing that the existing tariff rates were unjust and unreasonable as applied to its property. The Commission concluded that Union Tank had failed to carry its burden. "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, S.E.C. v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). The agency's path here is easily followed.
 
 
 20
 The judgment of the district court is affirmed.
 
 
 21
 Affirmed.
 
 
 
 [1]
 Thirteen other cars for which freight charges were originally claimed had been used in part within the United States. The Commission determined that Union Tank was not liable with respect to these cars, and that determination has not been challenged on review
 
 
 [2]
 Railroads other than the Santa Fe participated in the transport of the cars to Union Tank's repair facilities in Louisiana and Illinois but are not parties. Although the Missouri Pacific Railroad Company intervened and participated in the proceedings before the Commission, it is not a party on appeal
 
 
 [3]
 Uniform Freight Classification 11, Supplement 2, I.C.C. No. 7, Item 81400-B
 
 
 [4]
 B. B. Maurer, Agent, Mileage Tariff 7-D, Mileage Allowances and Rules Governing the Handling of and the Payment of Mileage on Cars of Private Ownership . . . by Railroads Parties to this Tariff, I.C.C. No. H-60, Item 125, Rule 3, P B.3 (effective May 1, 1973) (hereinafter cited as Mileage Tariff 7-D). The Santa Fe and "virtually all other American railroads," Indiana Harbor Belt R. R. v. United States, 510 F.2d 644, 647 (7th Cir.), Cert. denied, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), are parties to this tariff; none of the Mexican railroads on which the tank cars were used prior to their return to the United States in August of 1973 are parties
 
 
 [5]
 Mileage Tariff 7-D, Supra note 4, Item 125, Rule 3, P B.5
 
 
 [6]
 Jurisdiction was based on 28 U.S.C. § 1337
 
 
 [7]
 Section 5(e) of the Administrative Procedure Act, 5 U.S.C. § 554(e), authorizes an administrative agency to issue "a declaratory order to terminate a controversy or remove uncertainty."
 
 
 [8]
 Union Tank Car Co. Declaratory Order Empty Tank Cars, No. 36473, at 8 (I.C.C. Dec. 13, 1977). Division Two found that "in the absence of a mileage equalization rule," Union Tank's cars were "newly acquired" within the meaning of the tariff provision and therefore subject to applicable charges. Id. at 7. As of January 1, 1977, private tank car movements have been subject to a mileage equalization rule published in J. F. Doyle, Agent, Mileage Tariff 7-F, I.C.C. No. H-68, Supp. 23, Item 120. See General American Transportation Co. v. Indiana Harbor Belt R. R., No. 35404, at 11 & n.10, 36-37, 49 (I.C.C. June 10, 1977), Aff'd 577 F.2d 394 (7th Cir. 1978). This court, of course, expresses no opinion as to the proper treatment for similar empty movements after that date
 
 
 [9]
 Recently, Congress revised and recodified the Interstate Commerce Act, Pub.L. No. 95-473, 92 Stat. 1337, to begin at 49 U.S.C. § 10101. See Southern Ry. v. Seaboard Allied Milling Corp., 442 U.S. 444, 446 n.1, 99 S.Ct. 2388, 2390 n.1, 60 L.Ed.2d 1017 (1979). All of the events giving rise to this litigation occurred before the recodification, but the roughly parallel provisions in the recodification for the relevant provisions are as follows:
 49 U.S.C. Sec. 1(4) ........ 49 U.S.C. Secs. 10701(a),
 10703(a)(1), (2)
 49 U.S.C. Sec. 1(5)(b) .. 49 U.S.C. Sec. 10701(a), (b)
 49 U.S.C. Sec. 1(6) .......... 49 U.S.C. Sec. 10702(a)
 49 U.S.C. Sec. 1(10) ......... 49 U.S.C. Sec. 10102(3)
 49 U.S.C. Sec. 1(11) ......... 49 U.S.C. Sec. 11121(a)
 49 U.S.C. Sec. 6(7) .......... 49 U.S.C. Sec. 10761(a)
 
 
 [10]
 After sustaining the ICC's order in the judicial review proceeding, the district court directed the Santa Fe to "file an appropriate motion to consolidate the two cases or otherwise dispose of 76-C-2372." Although the Santa Fe's pending civil action was consolidated "for all purposes with 78-C-911" on January 22, 1979, no separate judgment, See Rule 58, Fed.R.Civ.P., with respect to No. 76-C-2372 appears in the record on appeal. Union Tank treated the order consolidating the two cases as an "adoption" of the order granting the motions for summary judgment in No. 78-C-911 filed by the United States and intervenor the Santa Fe. It also viewed the judgment entered in No. 78-C-911 as sufficient for No. 76-C-2372. Neither the United States nor the Santa Fe has raised any objection. The decision affirming the ICC decision effectively disposed of the issues in both cases. The district court appears to have intended that the consolidation serve as an "adoption" of its decision in the review proceeding. Therefore, we treat both cases as properly before us. See generally Bankers Trust Co. v. Mallis, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978)
 
 
 [11]
 "When a district court . . . refers a question or issue to the Interstate Commerce Commission for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to . . ., set aside, . . . any order of the Interstate Commerce Commission arising out of such referral." 28 U.S.C. § 1336(b)
 
 
 [12]
 See United States v. Western Pacific R. R., 352 U.S. 59, 65-70, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (discussing the factors relevant to the decision whether to refer questions of tariff construction to the ICC)
 
 
 [13]
 See, e. g., Spreckels Sugar Co. v. Southern Pacific Co., 308 I.C.C. 783, 785 (1959); Berman and Spector v. Atchison, T. & S. F. Ry., 308 I.C.C. 254, 255-56 (1959). See also J. Guandolo, Transportation Law 346-47 (2d ed. 1973)
 
 
 [14]
 See General American Transportation Co. v. Indiana Harbor Belt R.R., No. 35404, at 28-37 (I.C.C. June 10, 1977), Aff'd, 577 F.2d 394 (7th Cir. 1978); Union Tank Car Co., 268 I.C.C. 338, 341-42 (1947)
 
 
 [15]
 See Private Cars, 50 I.C.C. 652, 656-60 (1918). See generally 2 I. Sharfman, The Interstate Commerce Commission 120-41 (1931)
 Recent estimates are that railroads own only about three percent of the national tank car fleet. See General American Transportation Co. v. Indiana Harbor Belt R. R., No. 35404, at 30 n.27 (I.C.C. June 10, 1977); Mileage Allowances, Tank Cars Between Points in the United States, 337 I.C.C. 23, 26, 72 (1970).
 
 
 [16]
 See Use of Privately Owned Refrigerator Cars, 201 I.C.C. 323, 373 (1934); Private Cars, 50 I.C.C. 652, 671 (1918); Scofield v. Lake Shore & M. S. Ry., 2 I.C.C. 90, 116-19 (1888)
 
 
 [17]
 The Interstate Commerce Act prohibits carriers from transporting "property," as that term is used in the statute, free of charge. 49 U.S.C. § 6(7)
 
 
 [18]
 Although Union Tank Car Co. concerned only the "switching" of "bad order" cars, the principle relied on is not so limited. See, e. g., GATCO, supra, at 30, 34-35; Mileage Allowances, Tank Cars Between Points in the United States, 337 I.C.C. 23, 61-62 (1970)
 
 
 [19]
 In its consideration of the matter, Division Two was faced only with shipper objections that more types of empty mileage should be treated as movements of instrumentalities of transportation. In rejecting these claims, the Division said:
 (T)he movement of the car prior to its being part of the shipper's car fleet . . . is the same as the movement of a new railroad car by a foreign railroad prior to its delivery to the owning road. . . . (T)he shipper of a car for purchase, sale, or scrap is dealing with such a car as a commodity not as an instrument of transportation.
 Mileage Allowances, 337 I.C.C. at 31-32. Thus, after a car has been withdrawn from the domestic fleet, it should be deemed a "commodity" and not an "instrumentality of transportation" until it is again committed to the fleet.
 
 
 [20]
 "(T)he phrase 'prior to its first loaded move in commercial service,' when applied to a used car, can only have meaning when interpreted to mean its first commercial load after purchase of the use(d) car by the new owner." Andy Equipment, Inc. v. Roscoe, Snyder & P. Ry., No. 36164, at 4 (I.C.C. July 1, 1976) (citing Mileage Allowances, 337 I.C.C. at 61-62)
 Contrary to Union Tank's suggestion, this case does not hold that "newly acquired," as used in Paragraph B.5, can only refer to changes in ownership. Nor does the passage quoted above suggest such a conclusion. Rather, the holding of the case is that after a change in ownership a tank car is not entitled to transport without charge under Paragraph B.3 until after a loaded haul, but is instead subject to charges under Paragraph B.5. The passage quoted above indicates that a new owner may not rely on the prior owner's commitment of the car to service in the national fleet.
 
 
 [21]
 The theory of the decision is that since the need for routine repairs and maintenance of specific cars cannot be apportioned accurately among the "many different carriers" who derive benefit from the use of the cars that necessitates the maintenance work, GATCO, supra, at 35, it is impracticable for a private owner to prove that a specific carrier directly benefitted from use of its cars
 Indeed, far from conflicting with the present decision, GATCO provides support in its statement that "a rail car does not automatically maintain a permanent status as an instrumentality of transportation throughout its useful life." GATCO, supra, at 34.
 
 
 [22]
 In addition, Union Tank asserts that the district court confused the issues of applicability and reasonableness and ignored the findings of the ALJ and Division Two that Union Tank's cars had at some time in the past been part of the national fleet. We find no basis in the district court's opinion to support either contention
 
 
 [23]
 In its opening statement before the ALJ, Union Tank asserted that the Santa Fe's collection of the charges would constitute an unjust and unreasonable practice affecting rates in violation of 49 U.S.C. § 1(6) and an "unjust and unreasonable . . . practice with respect to car service" prohibited by 49 U.S.C. § 1(11). Union Tank withdrew its contention that collection of the charges would be unjust and unreasonable under the provisions of 49 U.S.C. § 1(5)(b). Although the ALJ found it unnecessary to consider these contentions because of his holding that the tariff provisions relied on by the Santa Fe were inapplicable, he incorrectly stated that Union Tank had relied on 49 U.S.C. § 1(6), (4), and (5)(b)
 In responding to the Santa Fe's contentions on appeal to Division Two of the Commission, Union Tank again argued that if the tariff provisions were applicable, they were unjust and unreasonable, but this time relied solely on 49 U.S.C. § 1(6). Nevertheless, Division Two specifically decided that the charges the Santa Fe is trying to collect had not been shown to be "unjust and unreasonable in violation of section 1(6), 1(4), or 1(5)(b)." Division Two probably meant to refer to § 1(11) instead of § 1(4). See note 25 Infra.
 In this court, Union Tank relies on both § 1(6) and § 1(11).
 
 
 [24]
 Atchison, T. & S. F. Ry. v. United States, 232 U.S. 199, 34 S.Ct. 291, 58 L.Ed. 568 (1914) and City Ice Delivery Co. v. Pere Marquette R. R., 39 I.C.C. 589 (1916), relied on by Union Tank in the Commission proceeding, are barely relevant. In the former, the Supreme Court rejected the carriers' contention that the ICC had set an unreasonably low rate for hauling ice in which fruit was packed and transported on the ground that the Commission had included compensation for hauling the ice in the rates allowed for hauling the fruit. In the latter, the Commission held that charges assessed against an ice shipper for the movement of the Carrier's refrigerator cars "from the point at which such cars are available to the point at which they are to be loaded," 39 I.C.C. at 591, were both discriminatory and preferential
 Union Tank relies particularly on the following sentence in City Ice : "An additional charge may be just and reasonable when refrigerator cars (rather than box cars) are used for the transportation of the ice, but it should be added to the rate for the transportation of the commodity and not imposed as a mileage charge for the movement of the empty car." Id. This was a response to the carrier's argument that the additional charges were necessary because its published rates for hauling ice were based on the use of box cars, which are less expensive to operate than refrigerator cars, Id. at 590, and provides no more support for Union Tank in this case than does the holding in Atchison, T. & S. F. Ry. v. United States.
 
 
 [25]
 "It shall be the duty of every carrier by railroad . . . to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared unlawful." 49 U.S.C. § 1(11)
 Some doubt exists as to whether Union Tank argued § 1(11) before the Commission and whether Division Two considered it as a ground for concluding that the charges proposed by the Santa Fe were not unjust or unreasonable as applied to Union Tank. See note 23 Supra. Given the statutory sections Union Tank itself has advanced during the long course of this proceeding and the obvious irrelevance of § 1(4), it seems likely that Division Two meant to conclude that the charges were not unjust or unreasonable under § 1(11) rather than § 1(4). It therefore seems best to rule on the § 1(11) argument. Cf. Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946).
 
 
 [26]
 In its opening statement before the ALJ, Union Tank relied on Compensation for Transportation Service, 332 I.C.C. 554, 565 (1968), Aff'd sub nom. Southern Ry. v. United States, 306 F.Supp. 108, 114-15 (E.D.Va.1969), and Assigned Cars for Bituminous Coal Mines, 80 I.C.C. 520, 556 (1923), Aff'd sub nom. United States v. Berwind-White Coal Min. Co., 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 1204 (1926). Neither case supports the proposition that collection of charges for transporting property is a "practice with respect to car service," as the phrase is used in § 1(11)
 The former case involved a carrier's attempt to charge a second carrier for transporting empty cars pursuant to Commission distribution orders issued under 49 U.S.C. § 1(15). The Commission held that it had no authority under § 1(15) to prescribe compensation for transporting empty cars. But more important for our purposes, it is clear that all the cars transported were part of the national car fleet. See 332 I.C.C. at 565 & n.6; See also id. at 562. Consequently, they were moved as "instrumentalities of transportation" and not "property." Similarly, to the extent that Assigned Cars is even relevant here, it does not support Union Tank's position. The only "practices" considered by the Commission in that case related to distribution among shippers of privately-owned coal cars that were used in transporting freight domestically and were therefore part of the national car fleet.