**BOSTON AND MAINE CORPORATION, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Windsor Minerals, Inc., State of Vermont, National Railroad Passenger Corp., Central Vermont Railway, Inc., Commonwealth of Massachusetts, Intervenors.**

Nos. 88–1631, 88–1728, 88–1731 and 88–1732.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 18, 1990.
Decided Aug. 10, 1990.

Eric L. Hirschhorn, with whom William D. Coston, Frederick J. Killion, and Arlene Pianko Groner were on the brief, for Boston and Maine Corp., petitioner in No. 88–1631. Richard K. Walker, Washington, D.C., also entered an appearance for Boston and Maine Corp.

Michael F. McBride, with whom Paul H. Falon, Washington, D.C., and Judith L. Truax, Boston, Mass., were on the brief, for the Com. of Mass., petitioner in No. 88–1732 and intervenor in No. 88–1631.

Charles I. Appler, with whom Basil Cole, Robert P. vom Eigen, Richard F. Riley, Jr., and Frederick C. Ohly, Washington, D.C., were on the brief, for Nat. R.R. Passenger Corp. and Cent. Vermont Ry., Inc., petition-ers in No. 88–1731 and intervenors in Nos. 88–1631, 88–1728 and 88–1732.

Charles H. White, Jr. and John T. Sulli-van, Washington, D.C., were on the brief, for Canadian Pacific, Ltd., petitioner in No. 88–1728.

Louis Mackall, Attorney, I.C.C., with whom Robert S. Burk, Gen. Counsel, I.C.C., James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan, and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the joint brief, for respondents.

G. Paul Moates, Ronald S. Flagg, and Terence M. Hynes, Washington, D.C., were on the brief, for intervenor State of Vt.

Daniel J. Sweeney and John M. Cutler, Jr., Washington, D.C., were on the brief for, intervenor Windsor Minerals, Inc., in No. 88–1631.

William G. Mahoney and John O'B. Clarke, Jr., Washington, D.C., were on the brief, for intervenor Ry. Labor Executives' Ass'n in No. 88–1731.

Before RUTH B. GINSBURG, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Concurring opinion filed by Circuit Judge RUTH B. GINSBURG.

BUCKLEY, Circuit Judge:

The action here under review is the Interstate Commerce Commission's approval of the National Railroad Passenger Corporation's request for the condemnation of 48.8 miles of Boston & Maine railroad track and attached property, which it immediately reconveyed to the Central Vermont Railroad. Because we find that the use of its condemnation power to force the conveyance of property from one private owner to another exceeded the Commission's authority under the Rail Passenger Service Act, we grant the petition for review and vacate the Commission's orders.

## I. BACKGROUND

### A. Statutory Background

In 1970, Congress responded to deteriorating rail conditions and passenger service by passing the Rail Passenger Service Act of 1970, Pub.L. No. 91–518, 84 Stat. 1328 (1970) ("RPSA" or "Act"). The Act provided for the creation of the National Railroad Passenger Corporation ("Amtrak") and set out various goals and guidelines for it to follow in reinvigorating intercity rail service. Section 402(a) of the Act provides, in relevant part, as follows:

> (a) [Amtrak] may contract with railroads ... for the use of tracks and other facilities and the provision of services on such terms and conditions as the parties may agree.... In the event of a failure to agree, the Interstate Commerce Commission shall, ... if it finds that doing so is necessary to carry out the purposes of this chapter, order the provision of services or the use of tracks or facilities of the railroad by [Amtrak], on such terms and for such compensation as the Commission may fix as just and reasonable, and the rights of [Amtrak] ... shall be conditioned upon payment by [Amtrak] of the compensation fixed by the Commission.

45 U.S.C. § 562(a) (1982). Section 402(a) by its terms governs situations where Amtrak is seeking the *use* of tracks ("trackage rights"), facilities, or services owned or provided by a particular railroad.

After passage of the RPSA, it became apparent that Amtrak was often unable to lease or purchase, on reasonable terms, properties that were required for its intercity passenger service. In response to this concern, among others, Congress passed the Amtrak Improvement Act of 1973, Pub.L. No. 93–146, 87 Stat. 552 (1973). The 1973 Act, *inter alia,* added subsection (d) to section 402 of the RPSA, which provides in pertinent part as follows:

> (d)(1) If [Amtrak] and a railroad are unable to agree upon terms for the sale to [Amtrak] of property (including interests in property) owned by the railroad and required for intercity rail passenger service, [Amtrak] may apply to the Commission for an order establishing the need of [Amtrak] for the property at issue and requiring the conveyance thereof from the railroad to [Amtrak] on reasonable terms and conditions, including just compensation. Unless the Commission finds that—
>
> (A) conveyance of the property to [Amtrak] would significantly impair the ability of the railroad to carry out its obligations as a common carrier; and
>
> (B) the obligations of [Amtrak] ... can adequately be met by the acquisition of alternative property (including interests in property) which is available for sale on reasonable terms to [Amtrak] ...
>
> the need of [Amtrak] for the property shall be deemed to be established and the Commission shall order the conveyance of the property to [Amtrak] on such reasonable terms and conditions as it may prescribe, including just compensation.

45 U.S.C. § 562(d)(1) (1982). Section 402(d) by its terms governs the case where Amtrak seeks the *conveyance* of a railroad's property to itself.

### B. Factual and Procedural Background

This case involves four consolidated petitions for review of orders of the Interstate Commerce Commission. The central participants are Amtrak, the Boston and Maine Railroad ("B & M"), and Central Vermont Railroad, the wholly owned subsidiary of Canadian National Railway Company, one of Canada's two transcontinental railroads.

The Connecticut River Line is a rail line running between Springfield, Massachusetts and White River Junction, Vermont. Prior to the transaction at issue here, B & M owned large stretches of the Connecticut River Line, while Central Vermont owned the remainder. B & M and Central Vermont have been longtime competitors in the freight rail business along the Connecticut Valley. Pursuant to a 1930 trackage agreement between the two, each had the right to operate over the other's rails. At White River Junction, the line splits into a westerly and an easterly fork. The westerly fork is owned by Central Vermont/Ca-

nadian National and continues up to St. Albans, Vermont, across the border into Canada, and on to Montreal. The easterly fork, owned by B & M, links up at the Canadian border with tracks of Canadian Pacific, Ltd., Canada's other transcontinental railroad. B & M track also splits off of this fork to serve Berlin and other towns in New Hampshire. At issue in this case is a 49–mile B & M-owned segment and associated facilities between Windsor and Brattleboro, Vermont (collectively, the "B & M segment").

Commencing in 1972, in response to a congressional determination that such service was in the public interest, Amtrak began running its "Montrealer" passenger train from Washington, D.C. through the Connecticut Valley to Montreal. The service was discontinued on April 5, 1987. Amtrak maintained before the ICC and maintains in these petitions that the discontinuation resulted directly from the poor condition of the B & M-owned tracks over which the Montrealer had to run. Amtrak alleged that B & M's failure to maintain the tracks in a condition that would permit passenger train service at 60 miles per hour ("mph") was a violation of a 1977 contract between Amtrak and B & M. B & M responded that that contract had expired and that it had no obligation other than to maintain the tracks in a condition capable of bearing its own 25 mph freight traffic. Although Amtrak maintains that B & M had stated unequivocally that it did not intend to upgrade the tracks and was considering abandonment of the line, B & M insists that it was ready to cooperate in the project to upgrade the tracks, provided that Amtrak agreed to pay for its share of the costs. B & M states that the incremental cost of maintaining tracks suitable for trains traveling at 60 mph as opposed to 25 mph would be $400,000 per year and asserts that it was Amtrak's statutory responsibility to bear this cost.

When Amtrak became convinced that B & M was not going to upgrade the tracks, it began discussions with Central Vermont. As Amtrak did not wish to own and apparently could not afford to purchase the B & M segment, an arrangement was worked

out whereby Amtrak agreed to use its powers of eminent domain under section 402(d) to effect the transfer of the property to Central Vermont. As described in an internal Central Vermont memorandum, this plan called for Amtrak to make an offer of one million dollars for the B & M segment. If B & M did not accept the offer—and the memorandum noted "we have reason to believe [B & M] will not accept it"—then Amtrak would take the B & M segment by eminent domain and reconvey it to Central Vermont. Memorandum from R. Lawless to G. Maas (Jan. 6, 1988), *reprinted in* B & M Brief at 67a–69a. In pursuit of this plan, on March 18, 1988, Amtrak and Central Vermont entered into three contracts dealing, respectively, with the acquisition of the B & M segment ("Acquisition Agreement"), the repair and rehabilitation of the segment after its acquisition ("Rehabilitation Agreement"), and operations over the property ("Operating Agreement").

Under the Acquisition Agreement, Deferred Appendix ("DA") at 225–38, Amtrak undertook to make the million dollar offer to B & M subject to the terms specified therein. DA at 231. Central Vermont agreed to provide Amtrak with the funds required to make the purchase in the event B & M accepted the offer. If B & M did not accept, Amtrak would file a section 402(d) application to acquire the property by eminent domain. *Id.* at 232. The agreement also provided that B & M would be allowed to retain the exclusive right to serve existing customers along the stretch of track it formerly owned so long as "B & M maintains its service at levels to be specified in the trackage rights agreement." *Id.* at 230. Central Vermont, however, would have the exclusive right to serve new facilities and shippers coming into existence on the line after its conveyance to Central Vermont. *Id.*

Under the Rehabilitation Agreement, DA at 239–57, Central Vermont undertook to rehabilitate the B & M segment to standards specified by Amtrak for payments which "will in no event exceed $3.1 million." DA at 241–42. Presumably, these payments would come out of a $5 million

grant that Congress had appropriated for the restoration of the Montrealer service. The Operating Agreement, DA at 258–88, which was in the form of an amendment to a 1978 contract between the two companies, required Central Vermont to maintain the B & M segment in accordance with the provisions of the earlier agreement and limited Amtrak's right to use the line to twenty years. DA at 261.

As required by the Acquisition Agreement, on March 18, 1988, Amtrak mailed a letter to B & M offering to purchase the segment for one million dollars on a fourteen-day "take-or-leave" basis. In its reply, B & M reaffirmed its continued readiness to negotiate the terms of compensation to be paid by Amtrak, expressed its willingness to submit the apportionment of the additional expenses to a third party such as the ICC, and concluded that "[i]n light of the above, it appears clear that there is no need to pursue the very complex 'offer to purchase' set forth in [Central Vermont's] letter, nor to comment in detail on the inapplicability of Section 562(d) to this situation." Letter from D. Fink to D. Sullivan (Mar. 29, 1988), *reprinted in* B & M Brief at 73a. Amtrak treated this letter as a rejection, and proceeded promptly with condemnation proceedings under section 402(d).

On April 26, 1988, the Commission issued the first of its orders, which found that Amtrak had been unable to reach agreement with B & M on the upgrading of the line. *National Railroad Passenger Corp.,* Finance Docket No. 31250, at 7 (Apr. 26, 1988). A series of procedural decisions followed, with B & M losing its bid to convert the proceeding into one under section 402(a) for a setting of reasonable rates by the Commission and the granting of trackage rights, as opposed to condemnation. Finally, on August 4, 1988, the Commission issued its major decision, *National Railroad Passenger Corp.—Conveyance of B & M Corp. Interests in Connecticut River Line in Vermont and New Hampshire,* 4 I.C.C.2d 761 (1988) ("Final Decision").

In its Final Decision the Commission found that there had been a failure to agree within the meaning of section 402(d), thus entitling Amtrak to a Commission determination on condemnation. *Id.* at 768–69. The ICC rejected B & M's argument that section 402(a) required that Amtrak first move for a conveyance of track rights; rather, it saw the statute as providing Amtrak with an election of remedies, *id.* at 770, and concluded that Amtrak had met the requirements of section 402(d) and was therefore entitled to condemnation. *Id.* at 769–71.

The Commission noted that it was without authority to pass on the constitutionality of an Act of Congress, *id.* at 771, and thus specifically refused to consider B & M's constitutional argument that if section 402(d) allowed this taking, it violated the public use requirement of the Fifth Amendment's takings clause. The ICC stated in dicta, however, that it would have found this conveyance to be for a public use. *Id.* at 771–72. Moving on to the issue of just compensation, the ICC fixed it at the higher of net liquidation value and going concern value, in this case $2,373,286. *Id.* at 780–81, 791. The Commission then exempted the transfer to Central Vermont from the competition scrutiny and formal approval otherwise mandated by 49 U.S.C. §§ 11343–11345 (1982), rejecting B & M's and Canadian Pacific's contention that the conveyance would greatly diminish rail competition in the area. *Id.* at 798–801.

Commission Chairman Gradison strongly dissented from the majority's conclusion. While acknowledging that Amtrak would have been entitled to an order conveying that portion of the B & M property which Amtrak "wanted and needed for intercity rail passenger service," Chairman Gradison believed the statute did not permit Amtrak "to restructure as between private, competing rail common carriers of freight that part of the ownership of the Conn River Line which it has admitted it does not need and does not want." 4 I.C.C.2d at 808–09.

Pursuant to the Commission's orders, the line was conveyed to Amtrak, which immediately reconveyed it to Central Vermont. Central Vermont completed an upgrading of the track using the funds granted Am-

trak by Congress, and, in July 1989, the Montrealer service was reinstituted.

There are four consolidated petitions for review before the court. The first and central petition is that of B & M, No. 88–1631, which protests the approval of the forced conveyance on both statutory and constitutional grounds and objects to the way in which the just compensation figure was derived. Next, in No. 88–1728, Canadian Pacific, which is Canadian National's large rival, argues that the transfer will adversely affect competition in the rail service market. In No. 88–1731, Amtrak and Central Vermont take issue with the valuation procedure, asserting that the Commission's figure was too high. Finally, in No. 88–1732, the Commonwealth of Massachusetts objects to the Commission's failure to ensure that Amtrak retained the right to use the B & M segment for passenger service in perpetuity and raises two additional issues which, at oral argument, it agreed were either moot or not ripe for judicial review. In addition, intervenor Railway Labor Executives' Association asks that if we vacate the ICC's order, in whole or in part, we also include in any remand order a requirement that the Commission protect the interests of employees who transferred employment from B & M to Central Vermont in reliance on the ICC's decision. Because we find that the forced conveyance exceeded the ICC's authority and vacate the Commission's order approving such transfer, we need not address any of the questions presented in the other petitions. We leave the issue of appropriate new protective arrangements for employees to the Commission in the first instance.

## II. Discussion

B & M argues that in enacting the RPSA, Congress did not intend that Amtrak be able to invoke the section 402(d) condemnation power as a means of securing the use of tracks belonging to another carrier; instead, Congress established section 402(a) as the means by which Amtrak could secure trackage rights necessary to its operations in cases where the parties proved unable to agree on the terms and conditions of such use. In such cases, the Commission is authorized by subsection (a) to order that Amtrak be authorized to use the tracks "on such terms and for such compensation as the Commission may fix as just and reasonable." B & M argues that that compensation must cover at least the "incremental cost" of the use of the tracks because section 402(a) specifically provides that

> the Commission shall, in fixing compensation in excess of incremental costs, consider quality of service as a major factor in determining the amount (if any) of such compensation.

45 U.S.C. § 562(a). B & M maintains that if Amtrak had proceeded through section 402(a), it would have been required to reimburse B & M for incremental costs attributable to Amtrak's need for 60 mph passenger service, which it estimates at $400,000 a year. B & M argues that Amtrak was essentially calling on B & M to subsidize Amtrak's passenger service because B & M was being asked to pay for a good (60 mph capacity) that was only of value to Amtrak.

B & M also asserts that such a request runs counter to congressional policy against cross-subsidization and other inefficiencies in the rail industry. *See General Am. Transp. Co. v. ICC*, 872 F.2d 1048, 1054–55 (D.C.Cir.1989), *cert. denied*, ⸺ U.S. ⸺, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990). B & M argues that it would be contrary to this policy and to the sense of the statute to interpret section 402(d) to let Amtrak do by condemnation what it cannot do under section 402(a); in fact, to allow Amtrak to find another railroad willing to offer the same service for less money, then condemn the property and transfer it to the lower bidder, would be to authorize bidding wars for Amtrak's condemnation privileges.

The Commission responds that the Act contains no provision that requires Amtrak to exhaust its remedies under section 402(a) before proceeding to section 402(d). It maintains that under the statutory scheme, Amtrak has a choice of remedies, and as long as it meets the literal require-

ments of section 402(d), it is entitled to a decision from the Commission on condemnation. The Commission did concede that the use of the section 402(d) proceeding was extraordinary—the first time, in fact, that it has ever been used. But the Commission defends the resort to condemnation as essential to what it candidly describes as an "imaginative financing device," namely, Amtrak's acquisition of title from B & M so that it might enter into a sale and lease-back transaction with Central Vermont on terms more advantageous than those available from B & M. As the Commission points out, this is "a well-recognized means of raising capital by selling an asset while still retaining the use of it." ICC Brief at 24.

We believe this last argument places the issue in proper focus. B & M does not dispute Amtrak's right to a condemnation determination on property that Amtrak claims it needs and wishes to acquire for itself. The issue, rather, is whether Amtrak has the authority to use section 402(d) to effect a change in ownership of rail lines between other parties. For the reasons discussed below, we conclude that the Act does not permit Amtrak to take property by eminent domain for which it concededly has no need itself merely because there is another private party that would like to have it and will pay Amtrak for the privilege of having it condemned.

As an initial observation, we note that although an agency interpretation of a statute committed to its administration is entitled to deference, it is nonetheless well settled that "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). Those tools of statutory construction include not only the wording of the statute but, where appropriate, an analysis of its legislative history and structure as well. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) (in ascertaining plain meaning of a statute, court must look to language at issue as well as to the language and design of the statute as a whole); *Thompson v. Thompson*, 484 U.S. 174, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988) (congressional intent to create implied right of action turns on inferences from language, statutory structure, and legislative history).

On examining the language and history of subsection (d) and the structure of section 402, we conclude that its meaning is unambiguous. We begin with an examination of the meaning of the subsection's language, as reinforced by its history.

A. The Language and History of Subsection (d)

Congress added subsection (d) to section 402 three years after the enactment of section 402(a). In explaining the purpose of the proposed subsection, which the House would later adopt, the Senate Report noted:

At the present time [Amtrak] leases terminal and other facilities from various railroads. These facilities are not always best adapted to Amtrak's needs, nor is a lease always the most economical means by which Amtrak could fulfill its requirements for a facility.... Because of the relatively inflexible site requirements of property [Amtrak] typically would want to acquire, Amtrak could be put in a very disadvantageous bargaining position.... Giving [Amtrak] the power of eminent domain, coupled with the ability to seek conveyance of the property through the Commission under this section, will insure that Amtrak can acquire the property necessary to perform its public service mission at a reasonable price.

S.Rep. No. 226, 93d Cong., 1st Sess. 4 (1973), *reprinted in* 1973 U.S.Code Cong. & Admin.News 2324, 2326–27. Thus one purpose for providing Amtrak with the power of eminent domain was to assure it of the ability to acquire the properties it needed for its intercity passenger service free of extortion.

As would be expected from the congressional purpose outlined above, section

402(d) explicitly provides that if Amtrak and a railroad

> are unable to agree upon terms for the sale to [Amtrak] of property ... owned by the railroad and *required for intercity rail passenger service*, [Amtrak] may apply to the Commission for an order establishing the need of *[Amtrak]* for the property at issue and requiring conveyance thereof from the railroad *to [Amtrack]*.

45 U.S.C. § 562(d)(1) (emphases added). It is clear enough that the statute contemplates that the property acquired by condemnation must be required by Amtrak for *its* use, as it alone is engaged in intercity rail passenger service. Yet, in the case before us, it is evident that the conveyance to Amtrak was one in form only, a necessary formality in consummating a scheme whose purpose was to effect a transfer of B & M's property not to Amtrak, but to Central Vermont.

In sanctioning that scheme, the Commission ignores the principle that the condemnation power is to be strictly construed to encompass only what is conferred by statute. *See United States v. Carmack*, 329 U.S. 230, 243 n. 13, 67 S.Ct. 252, 258 n. 13, 91 L.Ed. 209 (1946) (utility's condemnation power limited to those powers "expressed or necessarily implied"); Final Decision, 4 I.C.C.2d at 811 (Gradison, Ch., dissenting); *see also National R.R. Passenger Corp. v. Two Parcels of Land*, 822 F.2d 1261, 1264–65 & n. 3 (2d Cir.) (holding Amtrak's condemnation power to be of the more limited statutory variety as opposed to the broader sovereign power of eminent domain), *cert. denied*, 484 U.S. 954, 108 S.Ct. 347, 98 L.Ed.2d 373 (1987). First, the Commission's reading overlooks the limitation, already noted, that the property to be acquired must be for the use of Amtrak, and not one which, as here, Amtrak had no intention of retaining. As Chairman Gradison's dissent points out, the record is "shockingly clear" that Amtrak had neither the need nor the desire for the condemned interest. *Id.* at 809. The Chairman concluded, correctly, that section 402(d) does not permit Amtrak to secure the convey-

ance of an interest in property it does not need for its own use.

Second, even if the Commission were under no obligation to go beyond form to substance, its reading overlooks the requirement that the property taken must be one "required for intercity rail passenger service." While use of B & M's line was obviously needed for the Washington–Montreal run, Amtrak did not have to condemn the entire fee interest in the line in order to provide that service. Rather, what it required, and what in fact was all it sought in substance if not in form, was not title to the B & M segment but its use in a condition permitting resumption of the Montrealer service. As B & M points out, Amtrak could have commandeered that use under section 402(a), which authorizes the Commission to order the parties to enter into an appropriate trackage rights agreement.

B & M also argues that in the alternative, Amtrak could have invoked section 402(d) to secure an easement over the B & M segment, together with the right to improve and maintain the easement consistent with the granted use. It then reasons that as this lesser interest would meet Amtrak's needs, the condemnation of the greater interest was neither necessary nor permissible under the Act in light of the requirements of subsections 402(d)(1)(A) and (B).

These subsections require that if the requested condemnation is found to significantly impair the condemnee's "ability ... to carry out its obligations as a common carrier," 45 U.S.C. § 562(d)(1)(A), Amtrak's need is presumed to be established *unless* the Commission *also* finds that that need can be adequately met "by the acquisition of alternative property (*including interests in property*) which is available for sale on reasonable terms to [Amtrak]." *Id.* § 562(d)(1)(B) (emphasis added). In this case, the property taken is the entire fee to a large stretch of a railroad's main line.

In light of B & M's explicit claim of significant impairment, DA 341–47, we could not uphold a Commission determination that dismisses the railroad's detailed

exposition with the cursory statement that its ability to carry out its common carrier obligations will be adequately protected by the terms of a trackage rights agreement dictated by its competitor, Central Vermont. Final Decision at 773. The statute provides that the Commission's finding on impairment focus on the "conveyance of the property to [Amtrak]" and not on post-hoc remedies aimed at ameliorating the impairment that obviously would be caused by the conveyance of the entire fee interest in a railroad's main line.

Of course, even if there is impairment, the ICC must also find that Amtrak's need can be met by an alternative property before the presumption of need is disturbed. But here we find that the Commission has not seriously addressed B & M's argument that Amtrak's requirements could be met through the conveyance of a lesser interest. The Commission's Final Decision notes that

> B & M further argues that Amtrak could achieve its purposes under § 402(d) by acquiring an easement or trackage rights for passenger service without divesting B & M of ownership,

4 I.C.C.2d at 770, and dismisses the argument with the response that

> since § 402(a) provides for trackage rights, § 402(d) must have been intended to provide more. We find that Amtrak has demonstrated sufficient reason to justify acquisition of ownership of the line.

*Id.* By equating an easement in a rail line with trackage rights available under section 402(a), the Commission concludes that nothing less than the entire fee interest in a rail line may be condemned under section 402(d). The Commission thus reads the words "interest in property" out of the statute. As Amtrak was not seeking an easement, see Amtrak Application April 4, 1988, at 17, we need not decide whether section 402(d) contemplates the condemnation of such an interest. We do conclude, however, that the Commission failed to explain its decision adequately, as its rejection of B & M's "lesser interest" argument rested on the conclusory assertion that Amtrak has demonstrated sufficient reason to justify acquisition of the line.

The Commission readily acknowledges, in its brief, that rather than obtaining a property interest, Amtrak's real purpose was to secure the transfer of the trackage from B & M to Central Vermont. The ICC asserts on appeal that what was really "needed" here was a responsible owner for the B & M segment, one that could be counted on to maintain the tracks in a condition suitable for the Montrealer; as the only way to place the property in competent hands was for Amtrak to acquire it first and then reconvey it, the interim ownership of full title was necessary to its operations. ICC Brief at 24. The statute, however, is unambiguous in its provision that "the property at issue" is the proper focus of Amtrak's need, not the desirability of substituting one private owner for another.

Moreover, even assuming that the ICC's "responsible owner" rejoinder to B & M's "lesser interest" argument had merit, it emerges for the first time on appeal. The Commission's Final Decision makes no response to that argument other than the conclusory statement that Amtrak "has demonstrated sufficient reason to justify acquisition of ownership of the line." Final Decision at 770. This is not good enough. Although agency determinations are entitled to deference, "the agency must set forth the basis of [its] decision with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action." *Tarpon Transmission Co. v. FERC*, 860 F.2d 439, 442 (D.C.Cir.1988) (internal quotes omitted). In light of the statutory language limiting Amtrak's condemnation privileges to interests in property that are required for intercity rail passenger service, we find that the Commission's conclusory assertions fail the requirement of reasoned decisionmaking.

Finally, in light of the tremendous expansion of Amtrak's power that the Commission's reading of the statute would allow, we would expect to see a clearer statement from Congress that such was intended. Although we do not reach B & M's consti-

tutional argument that the forced conveyance approved by the ICC violated the public use requirement of the Takings Clause, we note that there are at least colorable Fifth Amendment problems with the statute as interpreted by the Commission. The Supreme Court has approved takings of private property for reconveyance to third parties when such transfers were central to the public interest at stake, such as breaking up oligopolistic land ownership patterns, *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), or slum clearance, *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). We are unaware, however, of any precedent approving such forced conveyances among private parties as a "means of raising capital" or as an "innovative financing device." *See* ICC Brief at 24. A court need not reach the constitutionality of a statute to acknowledge that the existence of significant constitutional questions counsel against imputing to Congress the intention to adopt the disputed meaning in the absence of some clearer evidence than we have here. *See Eastern R.R. Presidents Conf. v. Noerr Motors,* 365 U.S. 127, 137–38, 81 S.Ct. 523, 529–30, 5 L.Ed.2d 464 (1961). Such a rule of statutory construction is applicable even where an agency's interpretation might otherwise be entitled to deference. *See De Bartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 574–75, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988).

## B. Structure of Section 402

As noted above, the ICC declares that because "§ 402(a) provides for trackage rights, § 402(d) must have been intended to provide" for Amtrak's condemnation of the entire fee even though it only required those rights for its intercity passenger service. The Commission also argues that subsection (d) merely provides an alternative means for securing trackage rights that Amtrak is at liberty to exploit. With due respect, we submit that subsection (a)'s provision for Amtrak's use of a railroad's tracks reinforces our understanding of

Congress's intent in adding subsection (d) to the statute.

It would seem clear that in structuring section 402, Congress has created parallel procedures by which Amtrak can secure the services, facilities, and properties it requires at reasonable costs: one procedure, detailed in subsection (a), applies when Amtrak wishes to contract for the *use* of a railroad's services, tracks, and other facilities; the other, set out in subsection (d), applies when Amtrak needs to acquire a railroad's property for its own use. This is the framework that Congress created. The Commission's reading of subsection (d), however, sanctions the acquisition of a larger property interest than subsection (a) permits for purposes that subsection (d) does not explicitly authorize. It also allows Amtrak to circumvent the requirement that it bear the cost of maintaining B & M's line at 60 mph capacity merely by finding a buyer who is willing to pay Amtrak for the use of its condemnation powers.

Our reading of the interplay between subsections (a) and (d) is further supported by Congress's policy against cross-subsidization, that is, against having one segment of the rail industry bear the expense of facilities and improvements of primary benefit to another. *See General Am. Transp. Corp.,* 872 F.2d at 1054–55. Consideration of these broader congressional policies is beyond question a legitimate factor in determining the meaning to be given words and phrases that might otherwise be ambiguous. *See Don't Tear It Down, Inc. v. Pennsylvania Ave. Dev. Corp.,* 642 F.2d 527, 533 & n. 58 (D.C.Cir.1980). Read in the manner adopted by the ICC, the statute no longer gives effect to the policy against cross-subsidization. Rather, the arrangement would promote cross-subsidization by permitting Amtrak to cajole a railroad into providing more than its fair share of the maintenance. Otherwise, Amtrak may condemn the property because of the "low" state of repair and transfer it to a competitor who is willing to pay a premium to secure the financial advantages that might result from acquiring its competitor's properties. Either way, this would amount to a

subsidization of higher-cost passenger service by freight rail owners.

We thus conclude that the Commission's construction of the statute is contrary to its unambiguous meaning and Amtrak's use of its power of eminent domain invalid. Congress did not intend to allow Amtrak, by securing a competitor willing to deal with it on more favorable terms, to circumvent the requirements of section 402(a) and its policy against cross-subsidization, and the Commission's construction of the phrase "required for intercity rail passenger service" contravenes the plain meaning of section 402(d) as it allows the taking of property that was neither needed nor even wanted by Amtrak.

### III. CONCLUSION

Because we find the conveyance void on the grounds explained above, we do not reach B & M's further argument that the Commission did not find a "failure to agree" within the meaning of section 402(a), nor do we reach the valuation or competition issues raised by the other petitioners. As already stated, having found the Commission's interpretation invalid under the Act, we need not address B & M's constitutional argument. The petition for review in No. 88–1631 is granted; the order of the Commission approving the taking of B & M's track is set aside. The petitions in the other dockets are dismissed as moot in light of our disposition of No. 88–1631, which is remanded to the Commission for further proceedings consistent with this opinion.

*So ordered.*

RUTH B. GINSBURG, Circuit Judge, concurring in granting the petition for review in No. 88–1631:

I agree that a remand is warranted; I write separately, however, to emphasize that I rely on the inadequacy of the Commission's assessment *in this case*, not on the precedent-setting construction of the statute decreed by the majority opinion. My colleagues interpret section 402 of the Rail Passenger Service Act (RPSA), 45 U.S.C. § 562, as denying Amtrak recourse

to the full eminent domain power conferred by section 402(d) when Amtrak's ultimate aim is to secure only the *use* of tracks, a use for which section 402(a) provides. I am not convinced that the court, overriding the agency, has identified the only plausible reading of the statute; nor am I persuaded that if Amtrak is accorded any leeway to choose the property acquisition route when it could instead settle simply for trackage rights, the inevitable result will be "bidding wars" among private railroad companies for Amtrak's condemnation powers.

Nothing in the text of the RPSA, or in its legislative history, appears to me to force the conclusion, reached by my colleagues, that because trackage rights are central to the challenged transaction, Amtrak had to resort to section 402(a), or, alternately, attempt to condemn a lesser property interest (*i.e.*, secure an easement) under section 402(d), before invoking in full its section 402(d) eminent domain power. My colleagues find a textual basis for their conclusion in the statute's stipulation that if a planned condemnation would "significantly impair the ability of the [target] railroad to carry out its obligations as a common carrier," 45 U.S.C. § 562(d)(1)(A), Amtrak's need for the property sought will be disproven whenever the Commission also finds that Amtrak's passenger service obligations "can adequately be met by the acquisition of alternative property (including interests in property) which is available for sale [to Amtrak] on reasonable terms." 45 U.S.C. § 562(d)(1)(B).

The requirement that Amtrak exhaust any course short of full condemnation is triggered only when a proposed condemnation also threatens to impair the condemnee's performance as a common carrier. In this case, the ICC specifically concluded that the acquisition of B & M's track would pose no such threat:

> [B & M] has also failed to meet criterion (A), regarding significant impairment of B & M's common carrier obligations resulting from the conveyance. B & M is receiving just compensation for the property being conveyed and has the option of retaining its local traffic through a

trackage rights agreement. Its ability to carry out its common carrier obligations over its entire system, and even to the shippers on the line conveyed, will not be impaired.

*National Railroad Passenger Corp.— Conveyance of Boston and Maine Corp. Interests in Connecticut River Line in Vermont and New Hampshire,* 4 ICC 2d 761, 773 (1988). Given this explicit ICC determination under section 402(d)(1)(A), a determination within the ICC's expertise and entitled to judicial deference, the less restrictive alternative requirement of section 402(d)(1)(B), it seems to me, is simply not implicated in this case.[*]

Nor do I agree that allowing Amtrak to obtain trackage rights via its section 402(d) eminent domain powers necessarily renders superfluous section 402(a)'s trackage rights acquisition authority. Before obtaining ICC approval of a proposed condemnation, Amtrak, all agree, must establish that the property or property interests it seeks to acquire are "required for intercity rail passenger service." 45 U.S.C. § 562(d)(1). It is plausible, however, as I will next illustrate, that Amtrak's fulfillment of its intercity rail passenger service obligations might on occasion require not merely trackage rights, but trackage rights in conjunction with a transfer of ownership. In such instances, and such instances alone, the ICC could properly approve a use of section 402(d) of the kind undertaken here.

I recount in this light the story Amtrak tells. Following the purchase of the B & M line and a parallel line to the west, the Delaware and Hudson (D & H), by Guilford Transportation Industries in 1983 and 1984, service along B & M's Conn River Line deteriorated drastically. By 1987, when Montrealer service was temporarily discontinued, the average travel time over the Conn River Line had increased approximately 67% over 1981 levels; according to Amtrak, B & M repeatedly refused to upgrade the line, and even slated the segment for abandonment on its 1987 system map. Amtrak suggests that B & M's intransigence may have been motivated not by Amtrak's unwillingness to pay its fair share of the cost of maintaining the line to passenger service standards, but by B & M's conscious decision to favor its parallel D & H line. *See* Joint Brief of Intervenor–Respondents National Railroad Passenger Corporation, Central Vermont Railway, Inc., State of Vermont, and Windsor Minerals, Inc. at 4, 6.

Soon after the April 1987 Montrealer shutdown, Congress appropriated $5 million for improvements needed to restore Montrealer service. *See* Act of July 11, 1987, Pub.L. No. 100–71, 101 Stat. 391, 447 (1987). Under the circumstances as alleged by Amtrak, obtaining trackage rights from B & M under section 402(a) of the RPSA would not have sufficed to assure realization of the congressional objective to get the Montrealer back on track. B & M, in Amtrak's view, was unwilling, and would remain reluctant, to perform the necessary work: only trackage rights coupled with a change in the underlying ownership would do. Indeed, confining Amtrak to its section 402(a) avenue under such circumstances could have left it vulnerable to just the sort of extortion by private landowners pointed to by my colleagues as having motivated Congress to confer the eminent domain power contained in section 402(d). Had the ICC found from the record that the picture painted by Amtrak was accurate, therefore, I would uphold the challenged transaction.

No such ICC determination, however, can be gleaned from this record. Tugging just the other way, counsel for the ICC conceded at oral argument that the agency

---

[*] My colleagues contend that in conducting the subsection (A) inquiry into impairment of common carrier obligations, the ICC should have considered the effect of the condemnation in isolation, not as potentially alleviated by post facto remedies, such as the retention of trackage rights by the condemnee. If an approach so rigid were mandated by the RPSA, however, no outright condemnation could ever occur on any railroad with significant freight traffic—a drastic result unsupported by logic or by any discernible congressional intent. *Cf. Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 137, 98 S.Ct. 2646, 2665–66, 57 L.Ed.2d 631 (1978) (considering post facto remedies, such as transferred development rights, in evaluating whether historic preservation law effected a taking under the fifth amendment).

had made no independent effort to ascertain whether the B & M–CV conveyance was in fact required to meet Amtrak's passenger service obligations. ICC counsel further disavowed any doubt as to B & M's competence to maintain the track in question:

COUNSEL: Given the fact that Amtrak had this money to put into [track] rehabilitation....

COURT: So we're talking money?

COUNSEL: It wanted to make sure that the money was well spent, under the person who was exercising control over the maintenance.

COURT: Is there anything in the record to suggest that the root of the controversy between B & M and Amtrak was the competence of B & M to do the proper job ...?

COUNSEL: No....

Because these concessions indicate that the ICC shirked its obligation in this case to monitor closely Amtrak's exercise of the broad eminent domain power conferred by section 402(d) of the RPSA, I agree that the petition for review must be granted.